## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| LVI GROUP INVESTMENTS, LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 12067-VCG |
| | ) |
| NCM GROUP HOLDINGS, LLC, | ) |
| SUBHAS KHARA, EVERGREEN | ) |
| PACIFIC PARTNERS, L.P., | ) |
| EVERGREEN PACIFIC PARTNERS | ) |
| GP, LLC, EVERGREEN PACIFIC | ) |
| PARTNERS II, L.P., EVERGREEN | ) |
| PACIFIC PARTNERS II GP, L.P., | ) |
| EVERGREEN PACIFIC PARTNERS II | ) |
| GP, LLC, EVERGREEN PACIFIC | ) |
| PARTNERS MANAGEMENT | ) |
| COMPANY, INC., TIMOTHY | ) |
| BRILLON, MICHAEL NIBARGER, and | ) |
| TIMOTHY BERNARDEZ, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| NCM GROUP HOLDINGS, LLC, | ) |
| | ) |
| Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LVI GROUP INVESTMENTS, LLC, | ) |
| SCOTT STATE, PAUL CUTRONE, and | ) |
| NORTHSTAR GROUP HOLDINGS, | ) |
| LLC, | ) |
| | ) |
| Counter-Defendants. | ) |

**MEMORANDUM OPINION**

Date Submitted: February 23, 2018
Date Decided: March 28, 2018

Rudolf Koch, Matthew W. Murphy, and Matthew D. Perri, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Steven C. Florsheim, Greg Shinall, Daniel A. Shmikler, Michael G. Dickler, and Trevor K. Scheetz, of SPERLING & SLATER, P.C., Chicago, Illinois, *Attorneys for Plaintiff/Counter-Defendant LVI Group Investments, LLC*.

Richard D. Heins, Philip Trainer, Jr., and Hayley M. Lenahan, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL: Stephen Novack, Donald A. Tarkington, Andrew D. Campbell, Elizabeth C. Wolicki, and Yvette V. Mishev, of NOVACK AND MACEY LLP, Chicago, Illinois, *Attorneys for Defendant/Counter-Plaintiff NCM Group Holdings, LLC, and Defendants Evergreen Pacific Partners, L.P., Evergreen Pacific Partners II, L.P., Evergreen Pacific Partners GP, LLC, Evergreen Pacific Partners II GP, L.P., Evergreen Pacific Partners II GP, LLC, Evergreen Pacific Partners Management Company, Inc., Timothy Brillon, Michael Nibarger, and Timothy Bernardez*.

GLASSCOCK, Vice Chancellor

This Memorandum Opinion is the latest incarnation of the protracted litigation over the combination of two large demolition firms—LVI Group Investments, LLC and NCM Group Holdings, LLC—into a single entity, NorthStar Group Holdings, LLC. Each of the combining entities accuses the other of fraudulently misstating financial statements in the inducement of the transaction. Here, I address claims raised in LVI's amended complaint against third parties associated with NCM. These defendants have moved to dismiss; for the reasons that follow, that Motion is largely denied.

## I. BACKGROUND[1]

### A. The Parties

Plaintiff LVI Group Investments, LLC is a Delaware limited liability company that combined with Defendant NCM Group Holdings, LLC in 2014 to form NorthStar Group Holdings, LLC.[2] Like LVI, both NCM and NorthStar are Delaware limited liability companies.[3] LVI owns 62.5% of NorthStar, while NCM owns 37.5%.[4] Before the merger, LVI and NCM were two of the largest demolition companies in the United States.[5]

---

[1] The facts, drawn from the Complaint and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Motion to Dismiss.
[2] Compl. ¶¶ 1, 6–7.
[3] *Id.* ¶¶ 6–7.
[4] *Id.*
[5] *Id.* ¶ 18.

1

Defendant Subhas Khara was the President and CEO of NCM in addition to serving on its Board of Managers.[6] After the merger, Khara served as NorthStar's President until NorthStar's Board of Managers put him on administrative leave.[7] Khara continues to serve on NorthStar's Board.[8]

Defendants Evergreen Pacific Partners, L.P. and Evergreen Pacific Partners II, L.P. (collectively, the "EPP Funds") are Delaware limited partnership funds that together owned the vast majority of NCM's outstanding units.[9]

Defendants Evergreen Pacific Partners GP, LLC, Evergreen Pacific Partners II GP, L.P., and Evergreen Pacific Partners II GP, LLC (collectively, the "EPP GPs") are Delaware entities that serve as the EPP Funds' general partners.[10]

Defendant Evergreen Pacific Partners Management Company, Inc. ("EPP Management") is a Delaware corporation that managed the EPP Funds' investments in NCM.[11] I sometimes refer to all of the EPP entities collectively as "EPP."

Defendant Michael Nibarger is one of EPP's founders.[12] He also serves as a Managing Partner, Member, or Principal of the EPP GPs, and he is the Secretary and Vice President of EPP Management in addition to serving on its Board.[13] During

---

[6] *Id.* ¶ 8.
[7] *Id.*
[8] *Id.*
[9] *Id.* ¶ 9.
[10] *Id.*
[11] *Id.*
[12] *Id.* ¶ 10.
[13] *Id.*; Perri Aff. Ex. 2.

the relevant time period, Nibarger served on NCM's Board, and he continues to serve on NorthStar's Board.[14] Nibarger lives in the state of Washington.[15]

Like Nibarger, Defendant Timothy D. Bernardez helped found EPP and serves as a Managing Partner, Member, or Principal of the EPP GPs.[16] Bernardez is a co-President and director of EPP Management.[17] During the relevant time period, he served on NCM's Board, and he is currently a member of the NorthStar Board.[18] Bernardez resides in the state of Washington.[19]

Defendant Timothy Brillon is the CFO of EPP and a Member of the EPP GPs.[20] He also serves as CFO and Chief Compliance Officer of EPP Management.[21] During the relevant time period, Brillon was NCM's de facto CFO.[22] Like Nibarger and Bernardez, Brillon lives in the state of Washington.[23] I refer to Nibarger, Bernardez, and Brillon as the "Individual Defendants"; I refer to the EPP entities and the Individual Defendants as the "EPP Defendants."

---

[14] Compl. ¶ 10.
[15] *Id.*
[16] *Id.* ¶ 11.
[17] *Id.*; Perri Aff. Ex. 2.
[18] Compl. ¶ 11.
[19] *Id.*
[20] *Id.* ¶ 12.
[21] *Id.*
[22] *Id.*
[23] *Id.*

*B. Factual Background*

1. The Merger

LVI and NCM, two demolition companies, began merger discussions in October 2013.[24] After executing a non-disclosure agreement, the parties started to share information, including financial statements and forecasts.[25] The resulting letter of intent fixed a merger price based on each party's representation of its EBITDA.[26] EBITDA also served as the basis of the parties' division of NorthStar's equity; NCM ultimately received 37.5% of that equity based on its trailing twelve month EBITDA minus pre-closing debt.[27] The parties negotiated deal structure and performed due diligence throughout the latter part of 2013 and in 2014.[28] The merger closed in April 2014.[29]

The parties merged pursuant to a Contribution Agreement,[30] several provisions of which bear mentioning. In Section 2.4(b), NCM represented and warranted that the financial statements attached to the Contribution Agreement

> fairly present, in all material respects, the consolidated financial position of NCM Holdings and the NCM Subsidiaries as of their respective dates, and the consolidated results of operations and cash flows of NCM Holdings and each NCM Subsidiary for the respective

---

[24] *Id.* ¶ 18.
[25] *Id.*
[26] *Id.* ¶ 19.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* ¶ 1.

4

periods covered thereby, in conformity with GAAP consistently applied throughout the periods covered thereby.[31]

Section 5.4(f) provides that neither NCM nor LVI "has relied on any statements, representations or warranties whatsoever, other than the representations and warranties of the other Party expressly set forth in the Agreement."[32] The Contribution Agreement also contains an integration clause:

> This Agreement, including the Schedules and Ancillary Documents, constitute the entire Agreement between the Parties pertaining to the subject matter herein and supersede any prior representation, warranty, covenant, or agreement of any Party regarding such subject matter. No supplement, modification, or amendment hereof will be binding unless expressed as such and executed in writing by LVI Holdings and NCM Holdings.[33]

> The Contribution Agreement additionally contains an exclusive

remedies clause. There, NCM, LVI, and NorthStar agreed that their

> sole and exclusive remedies . . . arising out of, relating to or resulting from this Agreement (including the representations and warranties set forth herein . . .) and the transactions contemplated herein will be strictly limited to (i) the indemnification provisions contained in this Article 5, (ii) the provisions of Section 5.6 [relating to specific performance,] and (iii) claims for fraud against the Person who committed such fraud.[34]

Finally, Section 5.2(a) provides that NCM

> will indemnify and hold harmless [NorthStar] and each of its Subsidiaries from and against all Losses arising out of, relating to or

---

[31] Compl. Ex. A, § 2.4(b).
[32] *Id.* § 5.4(f).
[33] *Id.* § 6.6
[34] *Id.* § 5.4(e).

5

resulting from (i) any failure of any Surviving NCM Representation to be true or (ii) any breach of any covenant or agreement of NCM Holdings herein.[35]

### 2. The Fraud

LVI alleges that NCM and its affiliates intentionally inflated NCM's EBITDA to induce LVI to agree to the merger and give NCM an unjustifiably large stake in NorthStar.[36] The Complaint describes several of the improper accounting practices used to make NCM's financial performance appear stronger than it was. I recite only some of these practices; interested readers may turn to the Complaint for a more complete description.

NCM accounted for certain projects as if it expected to achieve its typical profit margin when it knew that project costs would offset most or all of the projected profits.[37] As the profits from older projects faded, NCM masked the inflated profits by booking new projects in the same misleading manner.[38] Another improper accounting practice involved NCM's use of percentage-of-completion accounting. Under that accounting methodology, "a company calculates its percentage of completion based on the ratio of its actual costs incurred to date to its total anticipated costs for the entire project (including appropriate change orders), and

---

[35] *Id.* § 5.2(a).
[36] Compl. ¶ 20.
[37] *Id.* ¶ 20(a).
[38] *Id.*

6

books any associated profits accordingly."[39] By intentionally understating its projected costs, however, NCM overstated the total potential profits from its projects and recognized those profits too quickly.[40] As projects neared completion and actual costs started to exceed projected costs, NCM was forced to reduce projected profits and, in certain cases, reverse profits that had already been booked.[41] These reductions and reversals were referred to as "fade" within NCM.[42] NCM concealed the "fade" in its projects by making adjustments gradually over several months rather than correcting the accounting immediately, and by booking inflated profits on new projects.[43]

NCM's improper accounting practices were reflected in the financial statements it provided to LVI in connection with the Contribution Agreement.[44] Those financial statements covered the two-month period ending February 28, 2014, and the 2012 and 2013 fiscal years.[45] According to NCM, the statements failed to accurately describe NCM's assets, liabilities, revenue, and EBITDA, among other things.[46]

---

[39] *Id.* ¶ 20(b).
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.* ¶ 20(c)–(d).
[44] *Id.* ¶ 40.
[45] *Id.* ¶ 42(a)–(e), (g).
[46] *Id.*

7

### 3. The EPP Defendants' Role in the Fraud

The Complaint describes in some detail Khara's role in the fraud, but because this Motion concerns the EPP Defendants, I recite only the allegations relevant to their conduct. As noted above, the EPP Funds held the vast majority of NCM's equity, and the Individual Defendants held high-level positions at EPP and NCM. According to the Complaint, the Individual Defendants "knew of, actively participated in, and directed the manipulation of NCM's financial statements, to deceive both NCM's lenders and LVI."[47] Brillon, NCM's de facto CFO, took instructions from Nibarger and Bernardez as to the manipulation of NCM's financial statements.[48]

As early as 2011, the Individual Defendants knew that NCM's financial statements contained significant inaccuracies.[49] Nibarger and Bernardez told Khara about their concerns regarding these inaccuracies, but NCM was unable to improve its performance or correct the issues that caused the misleading accounting.[50] The Individual Defendants therefore pushed NCM to manipulate its financial statements by recognizing fictitious revenue, delaying the recognition of "fade," and altering financial reporting documents.[51]

---

[47] *Id.* ¶ 46.
[48] *Id.* ¶ 47.
[49] *Id.* ¶ 48.
[50] *Id.* ¶¶ 48–49.
[51] *Id.* ¶ 49.

8

The Individual Defendants themselves played an important role in this process, making monthly accounting decisions for NCM.[52] For instance, in December 2011, NCM asked EPP for help in deciding how to book expected losses from NCM's Byron Rogers project.[53] Under GAAP, these losses should have been immediately recognized, but Nibarger's instruction, as relayed by Brillon, was to defer the "fade."[54] Later, in January 2012, NCM officer Dave Whitley informed Khara that, having followed Nibarger's instructions, he could not "'stand' on the integrity of the November financials."[55]

The Individual Defendants also told NCM to manipulate financial reports and projections to meet revenue targets.[56] In August 2011, as NCM was negotiating with its lenders, Brillon urged it to "keep in mind that we are forecasting $24M of EBITDA for 2011 so it needs to be higher than that since 2012 revenue should increase."[57] Brillon also said that "the lenders are going to want to see something in the $30M and up range."[58] Duane Kerr, NCM's CFO at the time, obliged, sending

---

[52] *Id.* ¶ 50.

[53] *Id.*

[54] *Id.*

[55] *Id.* The EPP Defendants have provided a copy of the January 2012 email. As the EPP Defendants point out, Whitley wrote in the email that "AP & Payroll issues coupled with the Asst Controller change (Allen to Ryan) have led to GL integrity issues." Defs.' Opening Br. Ex. B. Not mentioned by the EPP Defendants is that the same email also describes "[l]arge plugs to branch GM to tie WIP to GL (*I'm still very concerned about the accuracy and legitimacy of these entries*)." *Id.* (emphasis added).

[56] Compl. ¶ 51.

[57] *Id.*

[58] *Id.*

Brillon a forecast for $34 million the very next day.[59]  The forecast was later reduced to $31 million, but LVI alleges that the Individual Defendants knew that both projections were designed to mislead outsiders about NCM's financial prospects.[60]

The Individual Defendants continued to push NCM to recognize fictitious revenue and delay recognition of fade in 2012 and 2013.[61]  For instance, in the summer of 2013, as NCM was in the midst of refinancing its debt, EPP learned that NCM planned on reporting $1.2 million in EBITDA for its May financial statements.[62]  NCM had told its lenders that it would achieve $2.1 million in EBITDA, so this financial report could hurt the refinancing effort.[63]  Nibarger explained to Brillon and Bernardez that "[t]his cannot stand," and Bernardez told Brillon to "go through the W[ork In Progress ("WIP")] today job by job with Duane [Kerr] and Sage [Khara] to see where we can go up."[64]  Kerr cooperated by agreeing that NCM would report EBITDA of $2,004,773, a figure the Individual Defendants knew was false.[65]  Kerr also wrote in an email to Brillon that "'per our discussions,' NCM had instructed its branch managers to make a 'departure' from the financial reporting approach that NCM had 'preach[ed] to our managers.'"[66]  Kerr told Brillon

---

[59] *Id.*
[60] *Id.*
[61] *Id.* ¶ 53.
[62] *Id.* ¶ 54.
[63] *Id.*
[64] *Id.* (second and third alterations in original).
[65] *Id.* ¶ 55.
[66] *Id.* ¶ 56 (alteration in original).

that NCM would start taking "an aggressive approach to [its] WIP schedules," as a result of which NCM "may have some level WIP fade as those jobs come to completion."[67]

On September 5, 2013—one month before NCM and LVI executed a non-disclosure agreement—Brillon and Nibarger spoke about "'pushing some losses back into 2012,' so as to preserve the fraudulent bottom line on NCM's financial statements for 2013."[68] Around this time, Bernardez reached out to LVI board member Brian Simmons to discuss "potential combinations."[69] Later, on October 1, Brillon expressed concern that NCM's financial reports for August were "lower than what we were guiding the lenders to on the last lender call," and he instructed NCM to improve the numbers.[70] Kerr responded that he could increase EBITDA by, among other things, booking an additional $107,000 in income on several projects.[71] Kerr noted that "if the final results on those jobs prove not to be as positive as what we are expecting there will be fade experienced at the tail end of those jobs."[72] Brillon forwarded this email to Nibarger and Bernardez.[73] According to the Complaint, EPP knew that this fictitious income would be reversed through fade;

---

[67] Id.
[68] Id. ¶ 58.
[69] Id. ¶ 59.
[70] Id. ¶ 60.
[71] Defs.' Opening Br. Ex. G, at 1.
[72] Id.
[73] Compl. ¶ 60.

nevertheless, EPP pushed for its inclusion in NCM's financial reports in order to mislead its lenders and LVI.[74]

The next month, on November 25, 2013, Kerr told Brillon that while NCM's "initial numbers were much lower," it would report $1.1 million in EBIDTA for October.[75] Kerr reported that "[w]e went back to the branch managers to have them go over their WIPs with a fine tooth comb for revenues and cost savings that they may not have considered."[76] The Complaint alleges that EPP knew the $1.1 million figure was false because, again, some of it would inevitably be reversed through fade.[77] A few days later, Kerr sent NCM's revised 2014 budget to Khara, Bernardez, and Brillon.[78] Kerr wrote that, after receiving feedback from Brillon, "we went back to some of our larger branches . . . we were able to increase our projected revenues . . . (total $1.5M). We slightly increased margins . . . (total .3%). This resulted in an increase to EBITDA of $1.0M."[79] LVI alleges that both EPP and NCM knew the budget did not reflect a good-faith attempt at forecasting.[80]

---

[74] *Id.*

[75] *Id.* ¶ 61.

[76] Defs.' Opening Br. Ex. H.

[77] Compl. ¶ 61. The Complaint also alleges that "[d]espite the EPP Defendants' knowledge of, participation in, and direction of NCM's falsification of its financial statements, Bernardez falsely informed LVI on December 3, 2013 that NCM had 'cleaned up our WIPs' in connection with its recent bank refinancing." *Id.* ¶ 63.

[78] *Id.* ¶ 62.

[79] *Id.* (alterations in original).

[80] *Id.*

As merger negotiations continued, the Individual Defendants kept working with NCM to misrepresent its financial reports.[81] On January 28, 2014, for instance, Brillon told NCM not to "send over the WIP to LVI" until everyone could "agree on the December number for Byron."[82] As noted above, the merged closed in April 2014, and LVI and NCM combined to form NorthStar, in which LVI was to have a 62.5% interest, while NCM would obtain a 37.5% stake.[83]

### 4. Post-Merger Events

NorthStar began to encounter serious financial difficulty after the merger closed.[84] Specifically, NCM's projects were experiencing fade and thus not meeting NCM's projections.[85] LVI investigated the projects and found that NCM's pre-merger financials had been falsified.[86] Accordingly, on April 22, 2015, LVI sent NCM a Notice of Claim in accordance with Section 5.5(a) of the Contribution Agreement.[87] In the Notice of Claim, LVI identified NCM's "improper and undisclosed pattern and practice of understating estimated contract costs, overstating estimated profit, overstating job completion percentage, overstating earned profit,

---

[81] *Id.* ¶ 65.
[82] *Id.*
[83] *Id.* ¶¶ 6–7, 34.
[84] *Id.* ¶ 35.
[85] *Id.* ¶ 36.
[86] *Id.*
[87] *Id.* ¶ 43.

13

and overstating earned revenues – and in certain cases, overstating anticipated contract revenues."[88]  Almost a year later, this litigation commenced.

### 5. EPP Management

As noted above, the Complaint alleges that EPP Management, a Delaware corporation, managed the EPP Funds' investments in NCM.[89]  Nibarger is EPP Management's Secretary and Vice President, Bernardez is its co-President, and Brillon is its CFO and Chief Compliance Officer.[90]  Moreover, Nibarger and Bernardez serve on EPP Management's Board.[91]  In August 2013, NCM retained EPP Management pursuant to a written services agreement.[92]  In that agreement, NCM agreed to "engage[] [EPP Management] as a financial and management consultant," and EPP Management "agree[d] to provide financial and management consulting services" to NCM.[93]  EPP Management was also retained to consult with NCM's managers "in such manner and on such business and financial matters as may be reasonably requested from time to time by the Board, including (a) corporate strategy, (b) budgeting of future corporate investments, (c) acquisition and

---

[88] *Id.*
[89] *Id.* ¶ 9.
[90] *Id.* ¶¶ 10–12.
[91] Perri Aff. Ex. 2.
[92] Perri Aff. Ex. 4.
[93] *Id.* at NORTHSTAR14307035.

divestiture strategies, and (d) debt and equity financings."[94]  Under the services agreement, EPP Management would receive an annual fee of $1 million.[95]

Other documents support this description of EPP Management's role.  Under a management agreement between one of the EPP GPs and EPP Management, the latter was tasked with "manag[ing] [one of the EPP Funds'] portfolio of Investments on an ongoing basis, including monitoring and oversight of the Fund's portfolio companies."[96]  The agreement provided, however, that EPP Management's authority was "[s]ubject to the direction and control of the General Partner."[97]  In its latest Form ADV, filed on March 29, 2017, EPP Management represented that it provided "the day to day advisory services for the" EPP Funds.[98]  That same SEC filing reveals that the EPP GPs "operate as a single advisory business together with" EPP Management.[99]

Nevertheless, at their depositions, the Individual Defendants testified that EPP Management in fact performed a purely administrative function, handling issues such as bills, payroll, and leases.  For example, Nibarger stated that EPP Management "doesn't have any role in NCM, it's an administrative conduit . . . . [EPP Management] doesn't do anything but provide administration, arms and legs

---

[94] *Id.* at NORTHSTAR14307035–36.
[95] *Id.* at NORTHSTAR14307036.
[96] Perri Aff. Ex. 7, § 2(c).
[97] *Id.* § 2.
[98] Perri Aff. Ex. 3, at 1.
[99] *Id.*

15

for the general partner to make and manage its investments."[100]  For his part, Bernardez testified that EPP Management "do[es] things administratively; like sign the lease, pay the bills, those types of things."[101]  And Brillon averred that EPP Management simply handles "our bills, our payroll, our offices."[102]

### C. This Litigation

On March 3, 2016, LVI filed its initial complaint against NCM and Khara, alleging that the financial statements provided to LVI in connection with the Contribution Agreement were false and misleading.  NCM filed its answer and counterclaim on April 4, 2016, making similar allegations about LVI's financial statements.  NCM then amended its counterclaim, and on March 29, 2017, I dismissed some, but not all, of the counts in that pleading.[103]  I did not dismiss the fraud-related counts.[104]  Later, on May 3, 2017, after the parties had engaged in extensive discovery, LVI filed its amended complaint, adding the EPP Defendants as parties.

The Complaint contains eight counts.  Count I alleges fraud against NCM and Khara for their role in making false representations about NCM's financial condition

---

[100] Resp. to Suppl. Mem. Ex. 2, at 56:11–12, 57:3–5.
[101] Resp. to Suppl. Mem. Ex. 3, at 77:6–8.
[102] Resp. to Suppl. Mem. Ex. 4, at 55:1.
[103] *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 1174438, at *10 (Del. Ch. Mar. 29, 2017).
[104] *Id.* at *4–5.

to LVI.[105] Count II is also brought against NCM and Khara, and it alleges fraudulent inducement based on the same facts supporting Count I.[106] Count III seeks indemnification against NCM for breaches of the representations and warranties contained in Section 2.4 of the Contribution Agreement.[107] Count IV alleges that the EPP Defendants committed fraud by causing NCM to prepare false financial statements with the intent of inducing LVI to enter the Contribution Agreement.[108] Count V, also brought against the EPP Defendants, alleges that they fraudulently induced LVI to, among other things, merge with NCM.[109] In Count VI, LVI alleges that the EPP Defendants conspired with (or aided and abetted) NCM and Khara in a fraudulent scheme designed to induce LVI to enter the Contribution Agreement.[110] Count VII alleges that the EPP Defendants were unjustly enriched by the fraudulent scheme,[111] and Count VIII is brought against the Individual Defendants for negligent misrepresentation.[112]

On May 23, 2017, the EPP Defendants moved to dismiss the claims directed against them under Court of Chancery Rules 9(b), 12(b)(2) and 12(b)(6), and I heard

---

[105] Compl. ¶¶ 68–78.
[106] *Id.* ¶¶ 79–90.
[107] *Id.* ¶¶ 91–101.
[108] *Id.* ¶¶ 102–10.
[109] *Id.* ¶¶ 111–21.
[110] *Id.* ¶¶ 122–36.
[111] *Id.* ¶¶ 137–45.
[112] *Id.* ¶¶ 146–52.

argument on the Motion on October 17, 2017.[113]  At oral argument, I requested supplemental briefing on some of the personal jurisdiction arguments raised in the initial round of briefing.  The parties then submitted supplemental briefs informed by the discovery that has taken place since the October argument.

## II. ANALYSIS

### A. Rule 12(b)(2)

When a defendant moves for dismissal under Court of Chancery Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[114]  Before any jurisdictional discovery has taken place, the plaintiff "need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[115]  Where, as here, the parties have conducted discovery relating to personal jurisdiction, but the Court has not held an evidentiary hearing, the plaintiff's burden is heavier: she "must allege specific facts supporting [her] position."[116]  Nevertheless, the plaintiff in such a situation still gets the benefit of all reasonable inferences drawn from the record.[117]

---

[113] Khara and NCM answered the Complaint on May 17, 2017.

[114] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[115] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008).

[116] *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004) (quoting *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1301 (D. Del. 1990)).

[117] *See Reid v. Siniscalchi*, 2014 WL 6589342, at *5, *13 (Del. Ch. Nov. 20, 2014) (noting that jurisdictional discovery had been taken and finding that "[a]t this stage in the proceedings, the Court is required to draw all reasonable inferences in [the plaintiff's] favor, even if other inferences

18

This Court engages in a two-step analysis to determine whether it has personal jurisdiction over a nonresident defendant.[118]  First, the Court must evaluate "whether 'Delaware statutory law offers a means of exercising personal jurisdiction' over the nonresident defendant."[119]  Second, the Court "must determine whether exercising personal jurisdiction over the defendant passes muster under the Due Process Clause of the United States Constitution."[120]  The Court's exercise of personal jurisdiction over a nonresident defendant will satisfy due process "so long as there are 'minimum contacts' between the defendant and the forum."[121]

The Individual Defendants, all of whom reside in the state of Washington and have never spent time in Delaware,[122] argue that this Court lacks personal jurisdiction over them.  LVI responds with three theories of personal jurisdiction.  First, LVI argues that the Individual Defendants consented to jurisdiction in this state by serving as directors or officers of EPP Management, a Delaware corporation.  Second, according to LVI, the Individual Defendants consented to jurisdiction in Delaware by serving as Managers of the EPP GPs (two of which are Delaware

---

appear more probable"); *Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *4 (Del. Ch. Dec. 1, 2009) (same).

[118] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003).

[119] *Ruggiero v. FuturaGene, plc.*, 948 A.2d 1124, 1132 (Del. Ch. 2008) (quoting *Amaysing Techs. Corp. v. Cyberair Commc'ns, Inc.*, 2005 WL 578972, at *3 (Del. Ch. Mar. 3, 2005)).

[120] *Terramar Retail Ctrs., LLC v. Marion #2-Seaport Trust U/A/D/ June 21, 2002*, 2017 WL 3575712, at *5 (Del. Ch. Aug. 18, 2017).

[121] *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *3 (Del. Ch. June 29, 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[122] Defs.' Reply Br. Ex. 1, ¶ 6; Defs.' Reply Br. Ex. 2, ¶ 6; Defs.' Reply Br. Ex. 3, ¶ 6.

limited liability companies) or NCM itself (another Delaware limited liability company). Third, LVI suggests that the Individual Defendants are subject to personal jurisdiction by virtue of their participation in a conspiracy to defraud LVI. I find that LVI has met its burden of establishing personal jurisdiction over the Individual Defendants under Section 3114, the director consent statute.[123] Thus, I need not address LVI's other arguments for personal jurisdiction.

Section 3114 provides that a nonresident officer or director of a Delaware corporation consents to the exercise of personal jurisdiction over her "in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which [she] is a necessary or proper party, or in any action or proceeding against [her] for violation of a duty in such capacity."[124] Until the Delaware Supreme Court's decision in *Hazout v. Tsang Mun Ting*,[125] this Court had interpreted Section 3114 to allow personal jurisdiction over a nonresident director or officer only if she was alleged to have breached a fiduciary duty to the corporation she served.[126] In effect, the Court had read the "necessary or proper party" language

---

[123] 10 *Del C.* § 3114(a), (b).
[124] *Id.*
[125] 134 A.3d 274 (Del. 2016).
[126] *See, e.g.*, *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *9 (Del. Ch. Oct. 31, 2013) ("[F]or a nonresident director or officer of a Delaware corporation to be subject to personal jurisdiction in Delaware under Section 3114, the plaintiff must allege that the director or officer, acting in that capacity, breached a fiduciary duty to the Delaware corporation that they serve.").

20

out of the statute.[127]  The concern was that, if given literal effect, the "necessary or proper party" clause "could be susceptible to an overbroad reach that could endanger the constitutionality of § 3114."[128]

*Hazout* rejected this line of precedent and embraced the plain meaning of Section 3114.[129]  Under *Hazout*, this Court may exercise personal jurisdiction over a nonresident director or officer where the corporation is a named party and the corporate fiduciary is "a necessary or proper party" to the action.[130]  A director or officer is a "proper party" where she "has a tangible legal interest in the matter that is separate from" the corporation's.[131]  She is a "necessary party" if her rights "must be ascertained and settled before the rights of the parties to the suit can be determined."[132]  In either case, there must "be a close nexus between the claims involving the corporation which made it a party to the suit, and the conduct of the nonresident fiduciary."[133]  Thus, "only claims that involve conduct by the nonresident fiduciary using his corporate power will make him a necessary or proper

---

[127] *See In re USACafes, L.P. Litig.*, 600 A.2d 43, 53 (Del. Ch. June 7, 1991) ("Because the first clause of Section 3114 so plainly is susceptible to unconstitutional application, this court in *Hana Ranch* construed the word 'or' to mean 'and,' in effect reading this clause out of the statute." (citing *Hana Ranch, Inc. v. Lent*, 424 A.2d 28, 30 (Del. Ch. 1980), *abrogated by Hazout*, 134 A.3d 274)).
[128] *Hazout*, 134 A.3d at 285.
[129] *Id.* at 286–92.
[130] *Id.* at 289.
[131] *Id.* at 292.
[132] *Id.* at 289 (quoting 67A C.J.S. *Parties* § 3 (2015)).
[133] *Id.*

party."[134]  The Supreme Court recognized the potential for overbroad application of Section 3114, but found that the way to address that possibility is to "use the minimum contacts analysis required by [the due process clause] to ensure that the statute is not used in a situationally inappropriate manner."[135]

The facts in *Hazout* illustrate the breadth of its interpretation of Section 3114. The individual defendant, Marc Hazout, lived in Canada.[136]  He was a director of Silver Dragon Resources, Inc., a Delaware corporation headquartered in Toronto; he also held several high-level executive positions at the company.[137]  The plaintiff, Tsang Mun Ting, resided in Hong Kong.[138]  In 2012, Silver Dragon needed cash, and Hazout began negotiating on behalf of the company with Tsang and other Hong Kong investors over the terms of a potential capital infusion.[139]  By December 2013, the parties had reached an agreement under which Tsang and the other investors would lend Silver Dragon $3,417,265 in exchange for a security interest in the company's assets and control over its board.[140]  Once the terms were finalized, Hazout told Tsang and his colleagues that all of Silver Dragon's directors would sign

---

[134] *Id.*

[135] *Id.* at 291.  The Supreme Court also pointed to *forum non conveniens* doctrine as "a viable tool" for "address[ing] the burden to nonresident fiduciaries of addressing litigation in our state."  *Id.*

[136] *Id.* at 280.

[137] *Id.*

[138] *Id.*

[139] *Id.* at 280–81.

[140] *Id.* at 281.

the relevant agreement and resign from the board.[141]  Based on that representation, and before all of the signatures came in, Tsang wired the first installment of $1,014,140 to Silver Dragon.[142]  It soon became clear that one of Silver Dragon's directors would not sign the agreement.[143]  Hazout nevertheless refused to give the money back.[144]  Tsang eventually sued Hazout (and affiliated entities) in Delaware for fraud, unjust enrichment, and fraudulent transfer.[145]  Notably, Tsang did not sue Hazout for breach of fiduciary duty.[146]

The Supreme Court held that Hazout was subject to personal jurisdiction in Delaware under Section 3114's "necessary or proper party" provision.[147]  Hazout was a proper party

> because he ha[d] a tangible legal interest in the matter that [wa]s separate from Silver Dragon's interest, and because the claims against him ar[ose] out of the same facts and occurrences as the claims against Silver Dragon—alleged wrongs that Hazout committed in his capacity as the company's President and CEO.[148]

The Supreme Court then analyzed whether this exercise of statutory personal jurisdiction violated due process.[149]  The Court held that it did not.[150]  Indeed, it was

---

[141] *Id.* at 282.
[142] *Id.*
[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.* at 292.
[148] *Id.*
[149] *Id.* at 292–94.
[150] *Id.* at 294.

"not . . . a close question."[151]  First, Hazout had purposely availed himself of Delaware law by becoming the director and officer of a Delaware corporation.[152] "More important, the claims against Hazout involve[d] his actions in his official capacity of negotiating contracts that involved the change of control of a Delaware public corporation."[153]  Those contracts contained Delaware choice-of-law provisions, reflecting the parties' understanding that "the jurisdiction that was their focus" was Delaware.[154]  Thus, Hazout could not claim surprise at being haled into court in this state, and exercising personal jurisdiction over him posed no due process problem.[155]

At this stage of the litigation, *Hazout* permits me to exercise personal jurisdiction over the Individual Defendants under the "necessary or property party" clause of Section 3114.  Bernardez and Nibarger are both officers and directors of EPP Management, a Delaware corporation that is a party to this suit.  Brillon is EPP Management's CFO and Chief Compliance Officer.  Bernardez, Nibarger, and Brillon are proper parties because they have legal interests separate from those of the entities with which they are affiliated.[156]  And LVI has "allege[d] specific facts

[151] *Id.* at 292.
[152] *Id.*
[153] *Id.* at 293.
[154] *Id.*
[155] *Id.* at 293–94.
[156] *See, e.g.*, *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 60 (Del. Ch. Nov. 24, 2015) ("As the human through which the corporate principal acts, '[a] corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation

supporting its position" that the Individual Defendants were acting in their capacities as officers or directors of EPP Management when they engaged in their scheme to defraud LVI.[157] Specifically, the Complaint alleges that EPP Management managed the EPP Funds' investment in NCM, an allegation supported by contemporaneous documents. For example, in August 2013, NCM and EPP Management entered into a written services agreement in which NCM agreed to "engage[] [EPP Management] as a financial and management consultant," and EPP Management "agree[d] to provide financial and management consulting services" to NCM.[158] EPP Management was also retained to advise NCM's managers "in such manner and on such business and financial matters as may be reasonably requested from time to time by the Board, including (a) corporate strategy, (b) budgeting of future corporate investments, (c) acquisition and divestiture strategies, and (d) debt and equity financings."[159] These agreements are reflected in a recent EPP Management SEC filing, in which it represented that it provided "the day to day advisory services for the" EPP Funds.[160] It is reasonable to infer from these documents and the allegations in the Complaint that the Individual Defendants were acting as officers or directors

---

when he is a participant.'" (alteration in original) (quoting *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009))).

[157] *Medi-Tec of Egypt Corp.*, 2004 WL 415251, at *2 (quoting *Sears, Roebuck & Co.*, 744 F. Supp. at 1301).

[158] Perri Aff. Ex. 4, at NORTHSTAR14307035.

[159] *Id.* at NORTHSTAR14307035–36.

[160] Perri Aff. Ex. 3, at 1.

of EPP Management when they helped NCM defraud its lenders and, eventually, LVI.

The Individual Defendants' primary response is that they have all testified at their depositions that EPP Management did not actually provide the advisory services described in the written agreements. Instead, according to the Individual Defendants, EPP Management performed a purely administrative function—paying the bills, signing the leases, and handling payroll. That may turn out to be true. But at this stage of the litigation, my task is not to weigh conflicting evidence.[161] Instead, I must determine whether LVI has met its burden of setting forth specific facts supporting the exercise of personal jurisdiction over the Individual Defendants.[162] Moreover, in making this determination, I give LVI the benefit of all reasonable inferences drawn from the record. With the proper standard in mind, I have no trouble concluding that LVI has established a statutory basis for personal jurisdiction over the Individual Defendants.[163]

---

[161] *See Dow Chem. Co. v. Organik Kimya Holding A.S.*, 2017 WL 4711931, at \*10 (Del. Ch. Oct. 19, 2017) ("At this procedural stage, I need not weigh . . . conflicting evidence or determine whether the Plaintiffs have proven that Organik Kimya US was integral to Organik's misappropriation scheme.").

[162] *See id.* ("[M]y task is only to decide whether the Plaintiffs have satisfied their burden of 'alleg[ing] specific facts supporting [their] position' that this Court may exercise long-arm jurisdiction over the Foreign Defendants." (second alteration in original) (quoting *Medi-Tec of Egypt Corp.*, 2004 WL 415251, at \*2)).

[163] The Individual Defendants seek, in the alternative, a pretrial evidentiary hearing on the factual disputes related to personal jurisdiction. The more efficient procedure, it seems to me, is to defer resolution of these issues until trial. I therefore decline the Individual Defendants' invitation. *See Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del. Ch. 1991) ("The

26

That does not end the inquiry, however. I still must determine whether exercising personal jurisdiction over the Individual Defendants would offend due process. "To satisfy due process, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."[164] The question is whether the nonresident defendant "engaged in sufficient 'minimum contacts' with Delaware to require it to defend itself in the courts of this State."[165] "In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should 'reasonably anticipate' being required to defend itself in Delaware's courts."[166]

In my view, exercising personal jurisdiction over the Individual Defendants in this case is consistent with due process. Like the individual defendant in *Hazout*, Nibarger, Bernardez, and Brillon all agreed to serve as directors or officers of a Delaware corporation, EPP Management.[167] They have therefore "purposefully availed [themselves] of certain duties and protections under our law."[168] And there are several other connections between the Individual Defendants' conduct and this state. EPP Management allegedly managed the EPP Funds' investment in NCM, a

---

trial court is vested with a certain discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved.").

[164] *Vichi*, 2009 WL 4345724, at *10.

[165] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005).

[166] *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[167] *Hazout*, 134 A.3d at 292.

[168] *Id.*

27

Delaware limited liability company. The Complaint alleges that the Individual Defendants, acting in part as officers or directors of EPP Management, assisted NCM in defrauding LVI, another Delaware limited liability company. As a result of that fraud, LVI agreed to combine with NCM to form NorthStar, yet another Delaware limited liability company. Given these contacts between the fraudulent scheme and this state, the Individual Defendants should not be surprised to find themselves subject to litigation in Delaware.[169]

*B. Rule 12(b)(6)*

The EPP Defendants have moved to dismiss the counts in the Complaint directed against them under Court of Chancery Rule 12(b)(6) for failure to state a claim. When reviewing a Rule 12(b)(6) motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[170]

---

[169] *Cf. id.* at 291 n.60 ("For example, if plaintiffs attempted to drag corporate officers and directors into Delaware by naming them as defendants in a products liability case where the products had been designed and distributed from a state other than Delaware to diverse consumers, most of whom were in states other than Delaware, the minimum contacts test would provide substantial protection. It would be constitutionally questionable, to say the least, for Delaware to exercise personal jurisdiction when Delaware's status as the state of incorporation had no rational connection to the cause of action, where the conduct is governed by the laws of other states, and where there is no reason why a corporate fiduciary should expect to be named as a party at all, much less in a suit where the underlying conduct and claims have no rational connection to Delaware and provide no rational basis for Delaware to apply its own law.").

[170] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

28

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[171]

LVI alleges that the EPP Defendants are liable for fraud, fraudulent inducement, conspiracy to commit (or aiding and abetting) fraud and fraudulent inducement, and unjust enrichment. LVI also brings a claim for negligent misrepresentation against the Individual Defendants. I discuss each of these claims in turn.

### 1. Fraud and Fraudulent Inducement

The EPP Defendants argue that LVI has failed to state a claim for fraud or fraudulent inducement against them. "The elements of fraudulent inducement are the same [as] those of common law fraud."[172] To plead a claim for fraud, a plaintiff must allege "(i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages."[173]

Court of Chancery Rule 9(b) requires a plaintiff to plead fraud with particularity.[174] To satisfy Rule 9(b), the plaintiff must allege "(1) the time, place,

---

[171] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

[172] *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010).

[173] *Prairie Capital III, L.P.*, 132 A.3d at 49 (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[174] Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

29

and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations."[175]  A plaintiff need not plead knowledge or state of mind with particularity, because "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable."[176] The purpose of Rule 9(b) is to provide the defendant with "detail sufficient to apprise [her] of the basis for the claim."[177]

Where, as here, a plaintiff premises her fraud claim on written contractual representations, "it is relatively easy to plead a particularized claim."[178]  "The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract."[179]  In this situation, "the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false."[180] Put differently, the plaintiff "need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement

---

[175] *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).
[176] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993) (citation omitted).
[177] *Abry Partners V, L.P.*, 891 A.2d at 1050.
[178] *Prairie Capital III, L.P.*, 132 A.3d at 62.
[179] *Id.*
[180] *Id.*

30

was false."[181]  More specifically, "where a plaintiff is pleading a claim of fraud 'that

has at its core the charge that the defendant knew something, there must, at least, be

sufficient well-pleaded facts from which it can reasonably be inferred that this

'something' was knowable and that the defendant was in a position to know it.'"[182]

LVI alleges that the EPP Defendants, including Nibarger, Bernardez, and

Brillon, intentionally falsified NCM's financial statements to induce LVI to enter

into the Contribution Agreement.  As a result, LVI claims, the financial statements

attached to the Contribution Agreement contained misrepresentations in violation of

Section 2.4(b).  In that section, NCM represented that the financial statements it

provided in connection with the Contribution Agreement

> fairly present, in all material respects, the consolidated financial
> position of NCM Holdings and the NCM Subsidiaries as of their
> respective dates, and the consolidated results of operations and cash
> flows of NCM Holdings and each NCM Subsidiary for the respective
> periods covered thereby, in conformity with GAAP consistently
> applied throughout the periods covered thereby.[183]

LVI acknowledges that its fraud claims rest solely on the false representations

contained in the Contribution Agreement.[184]  The reason is that the agreement

---

[181] *Id.*

[182] *LVI Grp. Invs., LLC*, 2017 WL 1174438, at *4 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 147 (Del. Ch. 2004)).

[183] Compl. Ex. A, § 2.4(b).

[184] Pl.'s Answering Br. 31 ("Even assuming the EPP Defendants have the right to enforce the non-reliance provision, that provision does not support dismissal of LVI's claims because the false representations underlying LVI's claims for fraud *are* those made in the Contribution Agreement."); *see also Prairie Capital III, L.P.*, 132 A.3d at 50 ("Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on

31

includes an enforceable anti-reliance provision. There, LVI disclaims reliance "on any statements, representations or warranties whatsoever, other than the representations and warranties of the other Party expressly set forth in the Agreement."[185] Thus, the first question is whether LVI has adequately alleged the falsity of the representations contained in the financial statements NCM attached to the Contribution Agreement.

LVI points to eight separate categories of allegedly false information found in NCM's financial statements. I need not elaborate on each category, but I note that the financial statements attached to the Contribution Agreement covered the two-month period ending February 28, 2014, and the 2012 and 2013 fiscal years. For example, LVI pleads that NCM provided "the unaudited statements of operations, members' equity and cash flows of NCM Holdings and each NCM Subsidiary, on a consolidated basis, for the fiscal year ending December 31, 2013."[186] According to LVI, "[t]his information did not accurately or fairly state the Revenue, Gross Margin, Gross Margin %, EBITDA, and EBITDA Margin of NCM Holdings and

other information." (citing *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118–19 (Del. 2012))).

[185] *Id.* § 5.4(f). As noted above, the Contribution Agreement also contains an integration clause. *Id.* § 6.6 ("This Agreement, including the Schedules and Ancillary Documents, constitute the entire Agreement between the Parties pertaining to the subject matter herein and supersede any prior representation, warranty, covenant, or agreement of any Party regarding such subject matter. No supplement, modification, or amendment hereof will be binding unless expressed as such and executed in writing by LVI Holdings and NCM Holdings.").

[186] Compl. ¶ 42(c).

NCM Subsidiaries."[187]   These allegations are supported by a detailed recitation of NCM's fraudulent accounting practices.  For instance, NCM booked certain projects as if it would achieve its usual profit margin despite knowing that project costs would offset most of the projected profits.  When profits from these projects declined (as they inevitably did), NCM concealed the issue by booking new projects in the same improper manner.  And when the merger closed, LVI learned that "many NCM projects were not meeting NCM's projections," a direct result of the Defendants' fraud.[188]  Taken together, these allegations support a reasonable inference that the improper accounting practices described in the Complaint caused NCM's attached financial statements to be materially misleading.  Thus, LVI has adequately pleaded falsity.[189]

Next, I must determine whether LVI has successfully alleged that the EPP Defendants knew the financial statements contained in the Contribution Agreement were false.  In my view, the Complaint easily clears this bar.  As just noted, the financial statements at issue covered fiscal years 2012 and 2013, and the two-month period ending February 28, 2014.  The Complaint contains detailed allegations about

---

[187] *Id.*

[188] *Id.* ¶ 36.

[189] *See, e.g.*, *LVI Grp. Invs., LLC*, 2017 WL 1174438, at *5 ("The LVI Financial Statements stated certain amounts of profits and losses for particular jobs. After the Merger, profits and losses on those jobs proved lesser and greater, respectively. As a result, the assets contributed by LVI to NorthStar appeared misleadingly more valuable, affecting the allocation of equity in NorthStar between LVI and NCM. At this stage, these allegations are enough for me to infer a misrepresentation in the Contribution Agreement.").

the Individual Defendants' role in helping NCM commit accounting fraud both before and during the periods covered by the purportedly misleading financial statements. Beginning in 2011, the Individual Defendants were aware of significant irregularities in NCM's books. Nevertheless, because NCM was unable to improve its performance, the Individual Defendants encouraged it to conceal its financial difficulties by, among other things, recognizing fictitious revenue. For example, in December 2011, Nibarger, through Brillon, instructed NCM to violate GAAP by delaying the recognition of expected losses from the Byron Rogers project. Later, in the summer of 2013, after learning that NCM was planning on reporting a lower-than-projected EBITDA, Nibarger explained to Brillon and Bernardez that "[t]his cannot stand."[190] Bernardez then instructed Brillon to "go through the WIP today job by job with Duane [Kerr] and Sage [Khara] to see where we can go up."[191] Kerr eventually agreed that NCM would report an EBITDA figure that the Individual Defendants understood was false.

The Individual Defendants continued to play a role in manipulating NCM's financial statements as merger negotiations with LVI got underway. In November 2013, for example, Brillon learned from Kerr that NCM planned on reporting $1.1 million in EBIDTA for October. Brillon was also informed that NCM had gone

---

[190] Compl. ¶ 54.
[191] *Id.* (alterations in original).

"back to the branch managers to have them go over their WIPs with a fine tooth comb for revenues and cost savings that they may not have considered."[192] According to LVI, EPP was aware that the $1.1 million figure was misleading. Nonetheless, Bernardez falsely represented to LVI that NCM had "cleaned up our WIPs."[193] Several months later, in January 2014, Brillon instructed NCM to refrain from "send[ing] over the WIP to LVI" until everybody could "agree on the December number for Byron."[194]

Of course, these allegations remain susceptible to proof. But at the pleading stage, they collectively support a reasonable inference that the Individual Defendants knew NCM's financial statements, including those attached to the Contribution Agreement, were false. As the EPP Defendants point out, the representations and warranties in the agreement were made by NCM, not the Individual Defendants. But that is not fatal to LVI's fraud claims.[195] The question is whether LVI has pleaded

---

[192] Defs.' Opening Br. Ex. H.

[193] Compl. ¶ 63.

[194] *Id.* ¶ 65.

[195] *See Abry Partners V, L.P.*, 891 A.2d at 1064 ("To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State. That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show *either*: 1) that the Seller knew that the Company's contractual representations and warranties were false; *or* 2) that the Seller itself lied to the Buyer about a contractual representation and warranty." (emphasis added)); *see also Prairie Capital III, L.P.*, 132 A.3d at 61 ("At the pleadings stage, it is . . . reasonably conceivable that the Prairie Funds and the Prairie Fund Manager can be held liable for fraudulent contractual representations made by the Company. The Counterclaim sufficiently alleges that the Prairie Capital Directors knew that the Company's representations were false.").

facts suggesting that the falsity of the financial statements "was knowable and that the defendant[s] w[ere] in a position to know it."[196] It is reasonably inferable that the financial statements contained in the Contribution Agreement reflected the improper accounting practices engaged in by NCM and the Individual Defendants. Indeed, those practices continued during the merger negotiations between LVI and NCM. The Complaint therefore supports a rational inference that the Individual Defendants knew (or were in a position to know) that the financial statements contained in the Contribution Agreement were materially misleading. The Complaint also supports a plausible inference that the Individual Defendants were acting on behalf of the EPP entities during the fraudulent scheme, making it reasonably conceivable that those entities could be held liable for the fraud.[197] Thus, I decline to dismiss the fraud and fraudulent inducement counts.[198]

---

[196] *LVI Grp. Invs., LLC*, 2017 WL 1174438, at *4 (quoting *Metro Commc'n Corp. BVI*, 854 A.2d at 147)

[197] *See, e.g.*, *Gassis v. Corkery*, 2014 WL 3565418, at *5 (Del. Ch. July 21, 2014) ("Under agency principles, a corporation is liable for the acts of its officers and directors . . . ."), *aff'd*, 113 A.3d 1080 (Del. 2015).

[198] As noted above, the remaining elements of fraud—intent to induce action based on the misrepresentations, reasonable reliance, and damages—are easily met here because the false statements at issue are contained in a written agreement. Specifically, it is reasonable to infer that the Defendants wanted LVI to rely on the representations because they are found in the Contribution Agreement. It is also reasonably inferable that LVI relied on those representations and suffered damages because of that reliance.

## 2. Conspiracy to Commit (or Aiding and Abetting) Fraud and Fraudulent Inducement

LVI alleges that the EPP Defendants conspired with NCM and Khara to defraud LVI and induce it to enter into the Contribution Agreement. Alternatively, LVI pleads that the EPP Defendants aided and abetted the other Defendants' fraud. To state a claim for civil conspiracy, a plaintiff must allege "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[199] Like fraud, conspiracy to commit fraud must be pled with particularity, though knowledge may be averred generally.[200] To plead a claim for aiding and abetting, a plaintiff must allege "(i) underlying tortious conduct, (ii) knowledge, and (iii) substantial assistance."[201]

The EPP Defendants advance three arguments for dismissing the conspiracy count. First, they argue that the Contribution Agreement's exclusive remedies clause precludes a claim for conspiracy. Second, according to the EPP Defendants, LVI impermissibly attempts to allege a conspiracy among a parent, a subsidiary, and agents of the parent and subsidiary. Third, the EPP Defendants suggest that LVI has

---

[199] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006).
[200] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2014 WL 6703980, at *20 (Del. Ch. Nov. 26, 2014).
[201] *Id.* at *23.

failed to plead conspiracy to commit fraud with particularity. In my view, none of these arguments compels dismissal.

The Contribution Agreement's exclusive remedies clause provides that the

> sole and exclusive remedies of the Parties arising out of, relating to or resulting from this Agreement (including the representations and warranties set forth herein . . .) and the transactions contemplated herein will be strictly limited to (i) the indemnification provisions contained in this Article 5, (ii) the provisions of Section 5.6 [relating to specific performance,] and (iii) claims for fraud against the Person who committed such fraud.[202]

The Contribution Agreement further defines "Party" as "NCM Holdings, LVI Holdings or Holdco [that is, NorthStar]."[203] And it defines "Person" as "any individual, sole proprietorship, partnership, corporation, limited liability company . . . or any other business entity or association or any Government Authority."[204] The EPP Defendants read these provisions as preventing LVI from bringing a claim against them for conspiracy to defraud.

"Questions involving contract interpretation can be answered as a matter of law on a motion to dismiss '[w]hen the language of a contract is plain and unambiguous.'"[205] Thus, "a trial court may not, on a Rule 12(b)(6) motion to dismiss, 'choose between two differing reasonable interpretations of ambiguous

---

[202] Compl. Ex. A, § 5.4(e).

[203] *Id.* at 46.

[204] *Id.* at 47.

[205] *Fortis Advisors LLC v. Shire US Holdings, Inc.*, 2017 WL 3420751, at *5 (Del. Ch. Aug. 9, 2017) (alteration in original) (quoting *Allied Capital Corp.*, 910 A.2d at 1030).

38

provisions.'"[206]   Here, the exclusive remedies clause is ambiguous in two respects. First, it is unclear whether the EPP Defendants, as non-parties to the Contribution Agreement, have standing to enforce its provisions.[207]  NCM, as LVI's contractual counterparty, clearly has the right to invoke the exclusive remedies clause, but it is the EPP Defendants that rely on the clause in seeking dismissal of several counts of the Complaint.   And even if the EPP Defendants could enforce the exclusive remedies clause, there is another ambiguity that requires further factual development.  The clause in question allows LVI to pursue "claims for fraud against the Person who committed such fraud."[208]  It is a settled principle of conspiracy law that "where a conspiracy exists, the acts of each co-conspirator with respect to the aim of the conspiracy are attributable to the acts of the other co-conspirators under a theory of agency."[209]  In a sense, then, all members of a conspiracy to commit fraud have "committed such fraud," as the Contribution Agreement requires.[210]  If that is correct, LVI may pursue a claim for conspiracy to defraud against the EPP

---

[206] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1289 (Del. 2007)).

[207] *See Great Hill Equity Partners IV, LP*, 2014 WL 6703980, at *27–28 (upholding an unjust enrichment claim against the sellers of a company despite the existence of an exclusive remedies clause). *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708 (Del. Ch. July 23, 2010), relied on by the EPP Defendants, is not to the contrary.  There, the Court applied the principle that an unjust enrichment claim cannot stand where an enforceable contract governs the parties' rights. *Id.* at *7.  But, for the reasons discussed below, that principle does not apply here.

[208] Compl. Ex. A, § 5.4(e).

[209] *Matthew v. Laudamiel*, 2012 WL 605589, at *6 (Del. Ch. Feb. 21, 2012) (internal quotation marks and citation omitted).

[210] Compl. Ex. A, § 5.4(e).

39

Defendants without running afoul of the exclusive remedies clause. In sum, contractual ambiguities make it inappropriate to rule on the correct interpretation of the exclusive remedies provision at the pleading stage.

Next, the EPP Defendants argue that LVI's conspiracy claim ignores the principle that an entity cannot conspire with itself. As the EPP Defendants point out, this Court has held that "a corporation generally cannot be deemed to have conspired with its wholly owned subsidiary."[211] That rule "ensure[s] that the first element of civil conspiracy is met: the requirement that there be two or more persons or entities in a conspiracy."[212] The problem for the EPP Defendants is that NCM is not a wholly owned subsidiary of any of the EPP entities. Instead, according to the Complaint, "NCM is *principally* owned by the EPP Funds."[213] The EPP Defendants have cited no authority from this state for the proposition that a non-wholly owned subsidiary cannot conspire with its parent. Indeed, this Court has sustained conspiracy and aiding and abetting claims against a private equity firm alleged to have conspired with a company it controlled but did not wholly own.[214]

---

[211] *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006). *But see Allied Capital Corp.*, 910 A.2d at 1037 ("I refuse to use this motion as a basis for holding that, as a per se matter, commonly-controlled or even owned business entities cannot conspire with one another and be held liable for acting in concert to pursue unlawful activity that causes damage.").

[212] *Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012).

[213] Compl. ¶ 7 (emphasis added).

[214] *See Prairie Capital III, L.P.*, 132 A.3d at 64–65 (upholding, on a Rule 12(b)(6) motion to dismiss, a conspiracy claim premised on a conspiracy among a private equity firm, its principals, and a company controlled by the private equity firm). It is unclear whether the defendants in

The EPP Defendants also argue that LVI is improperly attempting to allege a conspiracy between a company and its officers or agents. They cite *Amaysing Technologies Corp.* for the proposition that "a corporation cannot conspire with its officers and agents."[215] *Amaysing* involved a corporation that allegedly engaged in an unlawful scheme with two of its officers and one of its agents.[216] Since there was no indication that these three individuals "were motivated by personal motives divergent from those of the corporation," the Court applied the general rule that a corporation cannot conspire with its officers and agents.[217] Here, however, it is reasonably conceivable that the Individual Defendants, acting on behalf of the EPP entities, conspired with Khara—NCM's former CEO—and NCM itself. In that case, the conspiracy would not be within a single entity, as was the case in *Amaysing*. True, the Individual Defendants also held positions at NCM, and if it were beyond dispute that they were wearing only their NCM hats when engaged in the conspiracy, dismissal might be appropriate. But at the pleading stage, I cannot exclude the

---

*Prairie Capital* sought dismissal based on the purported inability of a parent to conspire with its subsidiary. In any event, the EPP Defendants have pointed to no Delaware authority in support of a per se rule that a private equity firm and its principals cannot conspire with a company controlled (but not wholly owned) by them.

[215] Defs.' Opening Br. 9.

[216] 2005 WL 578972, at *7.

[217] *Id.* at *8; *see also LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2017 WL 3912632, at *2 (Del. Ch. Sept. 7, 2017) ("NCM's attempt to establish personal jurisdiction via a conspiracy theory fails because a corporation cannot conspire with itself. NCM alleges a conspiracy between LVI, LVI's CFO (Cutrone), LVI's CEO (State), and LVI board members." (footnote, internal quotation marks, and citation omitted)).

possibility that the Individual Defendants were acting solely as agents of the EPP entities when they purportedly conspired with Khara and NCM.[218]  Thus, I decline to dismiss the conspiracy count on this ground.

Finally, the EPP Defendants accuse LVI of failing to plead conspiracy to defraud with particularity.  Specifically, the EPP Defendants assert that the Complaint lacks facts suggesting "a meeting of the minds between the alleged defendants."[219]  I disagree.  As this Court has pointed out, "[e]ven to prevail at trial the [plaintiffs alleging a conspiracy] do not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators."[220]  The Complaint pleads in abundant detail that the Individual Defendants worked with Kerr and Khara to manipulate NCM's financial statements both before and during merger negotiations between NCM and LVI.  Moreover, the Individual Defendants, as principals of the private equity firm that held most of NCM's equity, had an obvious incentive to make the company's financials appear stronger than they actually were.  It is thus reasonably conceivable that the Individual Defendants, acting on behalf of the EPP entities, had "an agreement or common

---

[218] *See, e.g.*, *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("In deciding a motion to dismiss under Rule 12(b)(6), a trial court must accept as true all of the well-pleaded allegations of fact and draw reasonable inferences in the plaintiff's favor.").
[219] Defs.' Opening Br. 37.
[220] *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 806 (Del. Ch. 2009).

design" with NCM and its officers to defraud LVI.[221]  The Complaint states a claim for conspiracy.[222]

### 3. Unjust Enrichment

LVI avers that the EPP Defendants were unjustly enriched by the value they received from the fraudulently induced merger between NCM and LVI.  "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"[223]  "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[224]  In evaluating an unjust enrichment claim, I must first determine "whether a contract already governs the relevant relationship between the parties."[225]  "If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will

---

[221] *Prairie Capital III, L.P.*, 132 A.3d at 63.

[222] LVI does not discuss aiding and abetting in its brief, but the Complaint adequately alleges "concerted action by substantial assistance" and thus states an aiding-and-abetting claim. *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2 (Del. Super. Nov. 30, 2004).  Specifically, the Complaint makes it reasonably conceivable that the Individual Defendants, acting on behalf of the EPP entities, provided significant assistance to NCM and its officers in perpetrating a fraud on LVI.

[223] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).

[224] *Id.*

[225] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

43

be denied."[226] But when a plaintiff alleges that "it is the [contract], itself, that is the unjust enrichment," the existence of the contract does not bar the unjust enrichment claim.[227] In other words, "[t]he contract itself is not necessarily the measure of [the] plaintiff's right where the claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake and the [defendant] has been unjustly enriched by the benefits flowing from the contract."[228]

The EPP Defendants argue that the unjust enrichment claim should be dismissed for three reasons. First, they point to the Contribution Agreement's exclusive remedies provision, which purportedly bars LVI from pursuing an unjust enrichment claim. But, for the reasons discussed above, the exclusive remedies clause does not unambiguously apply to claims brought against the EPP Defendants,

---

[226] *Id.*

[227] *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008); *accord Great Hill Equity Partners IV, LP*, 2014 WL 6703980, at *27.

[228] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.01[b] (2016) (citing *McPadden*, 964 A.2d at 1276). Courts in other jurisdictions have held that a claim for unjust enrichment is not barred by an express contract where the contract was procured by fraud. *See, e.g.*, *Pramer S.C.A. v. Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 161 (App. Div. 2010) ("[A] claim for unjust enrichment is not duplicative of a breach of contract claim where the plaintiff alleges that the contracts were induced by fraud."); *Advanced Thermal Sci. Corp. v. Applied Materials Inc.*, 2009 WL 10671186, at *8 (C.D. Cal. Oct. 2, 2009) ("[I]f [a] contract was procured by fraud, is unenforceable, or is otherwise ineffective, then an unjust enrichment claim may lie."); *see also Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *15 (Del. Super. Nov. 28, 2017) ("Sealed Air argues that Novipax cannot recover for unjust enrichment because the APA governs the relationship between the parties. In other words, Sealed Air argues that Novipax cannot maintain both a cause of action for breach of contract and unjust enrichment. Sealed Air is correct; however, Novipax is asserting the two claims as alternative, not parallel, claims for relief. The principle [sic] claim in this case is for fraud and fraudulent inducement. Sealed Air argues that this fraudulent inducement renders the APA void. A claim for unjust enrichment may thus proceed under the theory that no valid contract exists." (footnote omitted)).

which were not parties to the Contribution Agreement. Thus, that clause does not defeat LVI's unjust enrichment claim at this stage.

Second, the EPP Defendants suggest that the Contribution Agreement exclusively governs LVI's rights in this action and thus precludes any claim for unjust enrichment. As just noted, "[w]hen the complaint alleges an express, enforceable contract that controls the parties' relationship, . . . a claim for unjust enrichment will be dismissed."[229] But that principle is inapplicable here, because LVI alleges that the execution of the Contribution Agreement itself enabled the EPP Defendants to obtain benefits to which they were not entitled. Indeed, LVI says that it would never have entered into the agreement but for the Defendants' falsification of NCM's financial statements.[230] LVI also avers that the Contribution Agreement gave NCM an unjustifiably high share of the equity in NorthStar based on NCM's manipulated financials. Thus, because the Complaint adequately alleges that the Contribution Agreement itself arose from the Defendants' fraud, the existence of that contract does not bar the unjust enrichment claim.[231]

---

[229] *Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006).

[230] Compl. ¶ 142.

[231] *See McPadden*, 964 A.2d at 1276 (declining to dismiss an unjust enrichment claim because the "Plaintiff alleges that it is the letter of intent, itself, that is the unjust enrichment; that is, Dubreville's manipulative conduct (which defendants concede) unjustly enriched him in the form of the contract for the sale of TSC to TSH" (footnote omitted)).

45

Third, the EPP Defendants argue that LVI has failed to plead either an enrichment or the lack of an adequate remedy at law. LVI attempts to plead enrichment by alleging that "[a]ll of the EPP Defendants unjustly received value from the NorthStar transaction based upon false or misleading reported financial results, and other compensation."[232] According to LVI, "[e]ach EPP Defendant received upstream benefit when its interest in the insolvent NCM was converted into an interest in NorthStar, which had value from the interests contributed by LVI."[233] It is true that these allegations do not identify the precise value received by each of the EPP Defendants in connection with the merger. At this stage of the litigation, however, I must "accept even vague allegations . . . as 'well-pleaded' if they provide the defendant notice of the claim."[234] LVI has alleged enough facts to apprise the EPP Defendants of how it believes they have been enriched.

LVI has also met its burden of alleging the absence of an adequate remedy at law. LVI's claim for unjust enrichment is an alternative pleading. If LVI were to succeed in establishing that the EPP Defendants committed (or conspired to commit) fraud, it would have an adequate remedy at law and unjust enrichment would be

---

[232] Compl. ¶ 143; *cf. Great Hill Equity Partners IV, LP*, 2014 WL 6703980, at *28 ("Because the Plaintiffs have not alleged that SIG Management, Goldman or Klahr received funds resulting from the fraud, restitution, as opposed to damages at law, is unavailable from those parties, and Count VI [alleging unjust enrichment] is dismissed as to them.").

[233] Pl.'s Answering Br. 42–43.

[234] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

46

unnecessary.  But LVI may be unable to prove those claims.  In that case, unjust enrichment might be invoked.  For example, LVI may be able to show that the EPP Defendants, though not liable for fraud themselves, profited from the fraud committed by the other Defendants.  This Court has previously sustained an alternatively pleaded unjust enrichment claim on this basis.[235]  I decline to dismiss LVI's claim for unjust enrichment.

### 4. Negligent Misrepresentation

LVI argues that, if the Individual Defendants are not entitled to the protections of the exclusive remedies clause, they may be held liable for negligent misrepresentation.  "A claim for negligent misrepresentation is often referred to interchangeably as equitable fraud."[236]  "To state a *prima facie* case for equitable fraud, [a] plaintiff must . . . satisfy all the elements of common-law fraud with the exception that [the] plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly."[237]  "While certain requirements are relaxed, a

---

[235] *Great Hill Equity Partners IV, LP*, 2014 WL 6703980, at \*28 ("Here, if the Plaintiffs prevail on their tort claims, unjust enrichment is unavailable, because an element of unjust enrichment is lack of a remedy at law, and should the Plaintiffs otherwise prevail, that element would be lacking. Seen in this way, unjust enrichment is an alternative pleading: assuming the Plaintiffs can prove that the Moving Defendants profited, and the Plaintiffs were impoverished, as the result of the non-moving Defendants' fraud; and assuming that Plaintiffs are unable to implicate the Moving Defendants in that fraud, unjust enrichment would be invoked.").

[236] *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at \*9 (Del. Ch. Jan. 30, 2015).  Indeed, at oral argument, LVI's counsel agreed that a claim for negligent misrepresentation "is effectively an equitable fraud claim."  Oct. 17, 2017 Oral Arg. Tr. 82:17.

[237] *Zirn v. VLI Corp.*, 681 A.2d 1050, 1061 (Del. 1996).

plaintiff claiming equitable fraud must sufficiently plead a special relationship between the parties or other special equities, such as some form of fiduciary relationship or other similar circumstances, which common law fraud does not require."[238] Thus, "[s]ophisticated contractual parties who bargain at arm's length generally do not qualify for the kind of equitable protection that the negligent misrepresentation [or equitable fraud] doctrine envisions."[239]

LVI's equitable fraud claim fails because "[t]his case does not involve a special circumstance that would merit exercising this Court's equitable power to go beyond the traditional framework of common law fraud."[240] The Defendants did not have a fiduciary relationship with LVI. Instead, "[t]he parties involved . . . were counterparties who negotiated at arms' length."[241] By all appearances, the Contribution Agreement was a carefully drafted document, and LVI and NCM, as two of the largest demolition companies in the United States, were presumably represented by competent counsel during the merger negotiations. This Court has

---

[238] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *13 (Del. Ch. Dec. 22, 2010). *But see, e.g.*, *Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *8–9 (Del. Ch. Apr. 10, 2008) (noting that the elements of a negligent misrepresentation claim are "(1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information," and holding that the "pecuniary duty requirement" is satisfied "where the defendant information provider expects to profit from the course of conduct in which he provides the information" (internal quotation marks and citation omitted)).
[239] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *5 (Del. Ch. Oct. 30, 2015) (footnote omitted).
[240] *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 144 (Del. Ch. 2009).
[241] *Id.*

48

regularly dismissed equitable fraud claims premised on similar circumstances.[242]

Thus, because LVI has failed to point to any "special equities" warranting a departure from common law fraud, I dismiss LVI's claim for equitable fraud.[243]

## III. CONCLUSION

For the foregoing reasons, the EPP Defendants' Motion to Dismiss is granted in part and denied in part. The parties should submit an appropriate form of order.

---

[242] *See, e.g.*, *Fortis Advisors LLC*, 2015 WL 401371, at *9 (dismissing a claim for equitable fraud where "the gravamen of the present dispute ar[ose] from a transaction that ostensibly was the product of arms-length negotiation between sophisticated parties"); *Osrma Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *15 (Del. Ch. Nov. 19, 2013) ("[T]his case involves counterparties to a purchase agreement that was negotiated at arm's length. OSI has failed to allege any special relationship of trust or confidence between itself and Sellers, and both OSI and Sellers are sophisticated parties who had access to competent counsel during the transaction. Thus, . . . I find that OSI has failed to plead the existence of any special equities in this case that would merit application of the doctrine of equitable fraud.").

[243] LVI tries to save its equitable fraud claim by pointing out that it is seeking restitution, an equitable remedy. This Court has previously held that a claim for equitable fraud may lie "where equity affords its special remedies, *e.g.*, 'rescission, or cancellation; where it is sought to reform a contract . . . or to have a constructive trust decreed.'" *U.S. West, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *26 (Del. Ch. June 6, 1996) (alteration in original) (citation omitted); *accord Grzybowski v. Tracy*, 2013 WL 4053515, at *6 (Del. Ch. Aug. 9, 2013). In my view, however, equitable fraud cannot be asserted simply by alleging common law fraud minus scienter and tacking on a request for restitution. As then-Vice Chancellor Strine put it, "[t]he use of a relaxed 'equitable' fraud standard, applying to all speakers, regardless of their arms-length relationship with the listener, arguably has greater societal costs than societal benefits, and undercuts the policy justification undergirding the scienter requirement of common law fraud. That is, if equitable fraud claims that do not require the plaintiff to prove scienter can be brought against any defendant, regardless of the relationship between the parties, then there would be no reason to ever assert a fraud claim under the more rigorous common law standard." *Homan v. Turoczy*, 2005 WL 5756927, at *13 n.40 (Del. Ch. Aug. 12, 2005).

49